# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 11bk38307 |
| Margaret Ann Johnsson, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| Catherine L. Steege, not individually | ) | |
| but as the Chapter 7 Trustee of the Estate | ) | |
| of Margaret Ann Johnsson, | ) | |
| | ) | Adversary No. 14ap00106 |
| Plaintiff, | ) | |
| | ) | Judge Timothy A. Barnes |
| v. | ) | |
| | ) | |
| Margaret Ann Johnsson, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ——————————————— | ) | |

TIMOTHY A. BARNES, Judge

## MEMORANDUM DECISION

The matter before the court arises out of the Complaint [Adv. Dkt. No. 1] (the "Complaint"), filed by Catherine Steege, not individually but as the Chapter 7 Trustee (the "Trustee") for the Estate of Margaret Ann Johnsson (the "Debtor"), in the above-captioned adversary proceeding (the "Adversary"), seeking to revoke the Debtor's bankruptcy discharge under 11 U.S.C. § 727(d). Count I of the Complaint seeks to revoke the Debtor's discharge under section 727(d)(1) for the Debtor's alleged failure to disclose a prepetition interest in real property ("Count I"), while Count II seeks to do the same under section 727(d)(2) for failures with respect to a postpetition inheritance received by the Debtor ("Count II"). The matter was tried before the court in a six-day trial. The trial began on February 2, 2016, resumed on March 7, 2016 and continued through and concluded on March 11, 2016 (collectively the "Trial").

For the reasons set forth herein, the court finds that it lacks jurisdiction to decide Count I of the Complaint. The court finds in favor of the Trustee on Count II of the Complaint and therefore holds that the Debtor's discharge must be revoked.

This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). A separate order will be entered pursuant to Bankruptcy Rule 9021.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding to revoke the discharge, much like an objection to discharge, may only arise in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(J); *Tidwell v. Smith (In re Smith)*, 379 B.R. 315, 322 (Bankr. N.D. Ill. 2010) (Schmetterer, J.); *Grochocinski v. Eckert (In re Eckert)*, 375 B.R. 474, 476 (Bankr. N.D. Ill. 2007) (Squires, J.).

While none of the parties have raised the issue of whether this court has constitutional authority to enter a final judgment on all counts of the Complaint in light of the United States Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), this court has an independent duty to determine whether it has such authority. *Rutkowski v. Adas (In re Adas)*, 488 B.R. 358, 379 (Bankr. N.D. Ill. 2013) (Hollis, J.).

The Complaint is based on sections 727(d)(1) and (2) of the Bankruptcy Code. Section 727 is unequivocally a bankruptcy cause of action. The court has constitutional authority to enter final orders in matters that involve the Debtor's discharge, "a matter which is designated as a 'core proceeding' and is at the center of the adjustment of the debtor-creditor relationship." *Wan Ho Indus. Co. v. Hemken (In re Hemken)*, 513 B.R. 344, 350 (Bankr. E.D. Wis. 2014) (relying on 28 U.S.C. § 157(b)(2)(J); *Stern*, 564 U.S. 462). As one bankruptcy court explains "[b]ecause the issue of whether a discharge should be revoked 'stems from the bankruptcy itself' . . . the Court also has the constitutional authority to enter a final order[.]" *McDermott v. Davis (In re Davis)*, 538 B.R. 368, 370 (Bankr. S.D. Ohio 2015) (citations omitted).

As revocation of discharge is a core proceeding that arises under the Bankruptcy Code, it is within the court's statutory core jurisdiction, and under existing Supreme Court precedent, there is no question as to the court's constitutional authority to hear and determine such claims. *See generally Stern*, 564 U.S. 462.

Accordingly, subject to the discussion following regarding section 727(e)(1) and Count I, final judgment is within the scope of the court's general statutory jurisdiction and constitutional authority.

## COUNT I

Despite having that general authority, the court cannot rule when it is deprived of statutory subject matter jurisdiction to do so as to a matter specifically. While the Debtor failed to argue that the court lacks subject matter jurisdiction as to this matter, "the court has an independent duty to

satisfy itself that it has subject-matter jurisdiction." *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994).

The Complaint alleges causes of action under sections 727(d)(1) and (2) of the Bankruptcy Code. Section 727(e), however, provides that:

> (e) The trustee, a creditor, or the United States trustee may request a revocation of a discharge—
>
> > (1) under subsection (d)(1) of this section within one year after such discharge is granted; or
> >
> > (2) under subsection (d)(2) or (d)(3) of this section before the later of—
> >
> > > (A) one year after the granting of such discharge; and
> > >
> > > (B) the date the case is closed.

11 U.S.C. § 727(e). Given that the case has not been closed, Count II is timely under the express terms of section 727(e)(2)(B).

As to Count I, however, the issue is not so clear. The Debtor received her discharge on December 20, 2011. Dkt. No. 42. The period within which to bring Count I under section 727(e)(1), which applies to Count I as it is a claim under subsection (d)(1), therefore, expired on December 20, 2012. The Trustee filed the Complaint on February 17, 2014. As a result, absent some other consideration, the Count I claim appears to be time-barred under section 727(e)(1). While, as discussed below, the Trustee had reason to believe the section 727(e)(1) period had been extended, the court must first determine the jurisdictional nature of section 727(e)(1) and whether such an extension is permissible.

Section 727(e)(1) "is not a mere statute of limitations, but an essential prerequisite to the proceeding." 6 *Collier on Bankruptcy* ¶ 727.18[1] (15th ed. 2015) (collecting cases). Indeed, numerous courts have classified the time limitations found in section 727(e) as jurisdictional in nature meaning that "any extension beyond the one-year deadline period with respect to revocation of discharge [even by agreement of the parties] is ineffective." *Car Care Center of Crystal Lake, Ltd. v. Miller (In re Miller)*, 336 B.R. 408, 413 (Bankr. E.D. Wis. 2005); *see also The Cadle Co. v. Anderson (In re Anderson)*, 476 B.R. 668, 673-74 (B.A.P. 1st Cir. 2012) (collecting cases). The statute is often juxtaposed with the limitations found in the Bankruptcy Rules, which, as judicially created rules, "do not create or withdraw federal jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004); *see also Anderson*, 476 B.R. at 673 *(discussing Kontrick)*; *Miller*, 336 B.R. at 411-12 (same). As *Kontrick* explains, "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick*, 540 U.S. at 452. Congress has done so with section 727(e)(1). *See Anderson*, 476 B.R. at 673 ("Consistent with *Kontrick*'s teaching, we have held that § 727(e)(1) is jurisdictional[.]"); *see also Gonsalves v. Belice (In re Belice)*, Adv. No. 09-01241-WCH, 2011 WL 4572003, at *4 (B.A.P. 1st Cir. Mar. 7, 2011). Effectively, the limitations set forth in section 727(e) set "an outside limit after which, regardless of

whether the cause of action has accrued, the cause of action is extinguished." *Apex Wholesale Inc. v. Blanchard (In re Blanchard)*, 241 B.R. 461, 465 (Bankr. S.D. Cal. 1999).[1]

Thus, section 727(e)(1) is jurisdictional in nature. What then, is the effect of the extension alluded to above? The Debtor and the Trustee entered into a tolling agreement on February 28, 2013, which tolled the "running of any limitation period applicable to any claim or cause of action the Trustee *may have* against the Debtor" for one year. Trustee's Ex. No. 58 (emphasis added) (the "Tolling Agreement"). The Tolling Agreement, to begin with, was ill-timed, being entered into *after* the section 727(e)(1) period had expired. Moreover, even if timely, a jurisdictional deadline cannot be extended by agreement. "It is well established that jurisdiction cannot be conferred upon a court by agreement of the parties." *Miller*, 336 B.R. at 413 (collecting cases). Moreover, "where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989) (quotation and citation omitted). The Tolling Agreement, therefore, does not remedy the lateness of the Count I claim.

Nor could the Trustee avail herself of the doctrine of equitable tolling to extend the time by which she can bring the claim. Equitable tolling can occur "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered[.]'" *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946) (*quoting Bailey v. Glover*, 88 U.S. 342, 348 (1874)). But equitable tolling is at odds with the statutory scheme within which section 727(e)(1) exists. As one court explains:

> Reading the doctrine of equitable tolling into § 727(e)(1) appears to upset a decision already made by Congress. Section 727(e)(1), when read in conjunction with § 727(d)(1), appears already to account for the circumstances that equitable tolling is designed to remedy. Section 727(d)(1), by its express terms, is not applicable unless the party requesting the revocation of a debtor's discharge did not know of the operative fraud until after the granting of a discharge. Thus, the application of § 727(d)(1) always involves a party who has not discovered fraud until some period after the debtor receives his or her discharge. Yet § 727(e)(1) clearly imposes a one-year time limit beginning from the date of the debtor's discharge, notwithstanding the fact that the party requesting revocation has not discovered the relevant fraud until some time after discharge. Accordingly, when § 727(e)(1) is placed against the backdrop of § 727(d)(1), it appears that Congress did not intend for equitable tolling to apply to § 727(e)(1).

---

[1] *Blanchard* goes further to explain that Section 727 is not a mere statute of limitations but rather a statute of repose. *Blanchard*, 241 B.R. at 464.

> The former generally limits the time for bringing a claim after it accrues, while the latter limits the time during which a claim can accrue in the first place. A statute of repose sets forth a period of repose, a given time span after the defendant's wrongful act in which a claim must accrue or be barred. A statute of repose bars a claim not because the plaintiff brought [its] claim too late, but rather because [its] injury occurred, and thus [its] claim accrued too late, after the expiration of the period of repose.

*Id.* at 465 n.5 (bracketed text in original).

4

*Dahar v. Bevis (In re Bevis)*, 242 B.R. 805, 809 (Bankr. D.N.H. 1999) (collecting cases of the same). The court finds this reasoning highly persuasive and agrees that the equitable tolling doctrine cannot help resurrect the Trustee's section 727(d)(1) claim.

As Count I of the Complaint, based on section 727(d)(1), was filed after the one-year limitations period in section 727(e)(1), the court lacks subject matter jurisdiction to determine Count I. Count I will be dismissed with prejudice, and the court makes no finding fact or conclusions of law as to Count I.[2]

## SPECIAL CONSIDERATIONS

This bankruptcy case has been extraordinary long and contentious. To date, there are over 400 entries on the docket of the main case and nine adversary proceedings. For a commercial chapter 11 case, these numbers would not be remarkable. But in an individual chapter 7 case these numbers are an indication of just how challenging it has been. This Adversary had two specific challenges that merit consideration here.

A.    The Debtor as a *Pro Se* Party

The Debtor has pursued her bankruptcy case and defended the Adversary *pro se*. This status brings into play several considerations.

First, as one court stated, "[a] *pro se* [party], while essentially treated the same as any other litigant, is entitled to a certain amount of assistance from the court." *Miller v. Marshall*, 457 B.R. 684, 690 (N.D. Ill. 2011) (collecting cases of the same). As the Seventh Circuit has made clear, courts should construe the filings of *pro se* litigants liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Korsunskiy v. Gonzales*, 461 F.3d 847, 850 (7th Cir. 2006) ("If the judge can see what the *pro se* litigant is driving at, that is enough.").

On the other hand, a litigant's appearance *pro se* does not mean she will be graced with "special treatment as a reward for her decision to represent herself." *In re de Kleinman*, 136 B.R. 69, 71 (Bankr. S.D.N.Y. 1991). *Pro se* litigants are still responsible to know and comply with the relevant procedural rules and substantive law. *Faretta v. Cal.*, 422 U.S. 806, 834 n.46 (1975) ("The right of self-representation is not . . . a license not to comply with relevant rules of procedural and substantive law.").[3] The Seventh Circuit has explicitly stated that "pro se litigants are not entitled to

---

[2]        Count I alleges that the Debtor obtained her discharge through fraud by failing to report the Debtor's interest in certain real property located at 3744 North Richmond, Chicago, Illinois. Nothing herein should be construed as a ruling on the merits of the issues presented in Count I, including, but not limited to, the Debtor's ownership interest in the real property located at 3744 North Richmond, Chicago, Illinois or whether said property is property of the Debtor's bankruptcy estate.

[3]        While *Faretta* is a criminal case, numerous courts have found that it applies in civil proceedings and in bankruptcy proceedings in particular. *See, e.g., Eagle Eye Fishing Corp. v. U.S. Dep't. of Commerce*, 20 F.3d 503, 506 (1st Cir. 1994) (*Faretta* applicable in civil proceedings); *Labankoff v. U.S. Trustee (In re Labankoff)*, BAP No. NC-09-1300-PaJuKw, 2010 WL 6259969, at *7 (B.A.P. 9th Cir. June 14, 2010) (*Faretta* applied in bankruptcy proceeding); *de Kleinman*, 136 B.R. at 71 (same).

a general dispensation from the rules of procedure or court imposed deadlines." *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996); *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994).

As to the first consideration, the court has endeavored to determine what the Debtor was "driving at" and thereby grant her appropriate relief.[4] The court has also been lenient when the circumstances warranted. In this Adversary, while not required to do so, the court has excused the Debtor missing or ignoring numerous deadlines. For example, on May 20, 2015, the court entered an order scheduling the parties' depositions for June 23, 2015. Adv. Dkt. No. 54. The Debtor did not appear for the deposition. The Trustee brought a Motion for Sanctions Pursuant to Fed. R. Bankr. P. 7037 requesting the entry of a default judgment as discovery sanctions. Adv. Dkt. No. 55. While default judgment was a possible remedy under the Rules, the court instead directed the Trustee to reschedule the deposition. *See* Adv. Dkt. No. 68. Likewise, the court permitted the Debtor to testify in narrative form, something most courts decline to do. *See, e.g., U.S. v. Beckton*, 740 F.3d 303, 306 (4th Cir. 2014) (trial court did not abuse its discretion in denying *pro se*'s request to testy in narrative form); *Hutter N. Trust v. Door Cnty. Chamber of Commerce*, 467 F.2d 1075, 1078 (7th Cir. 1972) (same).

Despite these accommodations, the Debtor's behavior repeatedly called into question the balancing of the *pro se* considerations. The Trial remained as contentious as the rest of the Adversary and the bankruptcy case. The Debtor verbally attacked and made hostile accusations against the Trustee. *See, e.g.,* Tr. 61, Mar. 11, 2016 (accusing the Trustee's law school and the Trustee as a graduate thereof of perpetuating corruption). Similar attacks had taken place during the Adversary leading up to the Trial and in the bankruptcy case. *See, e.g.,* Hr'g Tr. 33-35, Apr. 7, 2015 (accusing the Trustee of being part of the Irish sect of the Ku Klux Klan).

The Debtor's ire is not saved only for the Trustee but for anyone she views as opposing her. After the Trial, the Debtor commenced multiple new adversary proceedings, including one naming a staff attorney in the United States Trustee's Office as a defendant. Nor is the court and its staff immune from this behavior. The Debtor repeatedly interrupted the court even when the court was attempting to give guidance to the Debtor. *See, e.g.,* Tr. 17, Feb. 2, 2016; Tr. 131-32, Mar. 7, 2016; Tr. 47-48, Mar. 8, 2016. The Debtor has also recently taken to questioning the court's staff's functions and authorized use of the Judge's signature stamp.

The Debtor was unwilling to accept the assistance of the court when offered. For example, when the Debtor sought to admit the Debtor's Exhibit No. 28, the Trustee objected on the grounds that it was not produced during discovery, relevance, hearsay and foundation. While the Debtor could not articulate reasons to overcome these objections, the court court could nonetheless see

---

[4]      Such accommodations also took place in the bankruptcy case when the Debtor brought a Motion for Disbursement of Homestead Exemption [Dkt. No. 293], a Motion for Disbursement of Wild Card Exemptions [Dkt. No. 313] and made a similar request in the Pro Se Debtor's Response to the Trustee's Objection to Debtor's Amended Claims of Exemptions [Dkt. No. 385] (collectively the "Disbursement Filings"). In the Disbursement Filings, the Debtor requested that the Trustee disburse, from property of the estate, funds which the Debtor claimed as exempt prior to the filing of the Final Report. Despite such an unusual request, the court concluded that the Debtor have satisfied the minimum burden with respect to some of the requests and permitted the relief requested with respect to those requests. *See* Dkt. Nos. 309, 321 and 393.

what the Debtor was "driving at." But getting there required several steps, which the Debtor resisted. The court stated then: "I just want you to understand, I'm giving you everything you need, but I can't give it to you in one lump sum. I'm giving you a clear path to get what you need." Tr. 83, Mar. 10, 2016. The Debtor, unwilling to accept the court's help, continued to argue. Finally, the Debtor's recalcitrance resulted in the Trustee's objection being sustained. *See generally id.* at 77-84.

Despite all the foregoing issues, the court is convinced that the proper balance was struck. What results, as set forth herein, is what the law requires. No more, no less.

B.    Attorney-Client Privilege

A second challenge relates to the attorney-client privilege. The attorney-client privilege protects the confidential communications between attorneys and clients. *U.S. v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990).

Throughout the Trial, the Trustee called three witnesses who were the Debtor's former attorneys; Deborah Ebner ("Ebner"), Michael Burstein and William H. Pokorny. These witnesses were clearly uncomfortable to be put in this position but the Debtor did little to rectify the situation. In fact, at times the Debtor explicitly waived the privilege. *See e.g.*, Tr. 65, 82, Mar. 7, 2016 (waiving privilege during Mr. Pokorny's cross-examination).

While the court was wary in allowing these witnesses to testify, the court remained bound by relevant case law, statutes and rules. The privilege must be affirmatively asserted by the Debtor, and the court could not do so on her behalf. *U.S. v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997); *Carte Blanche (Singapore) PTE, LTD. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 31 (S.D.N.Y. 1990) ("[T]he privilege must be claimed and not waived by the client.").

Also, many of the documents used at the Trial were communications between the Debtor and Ebner. The Debtor had produced these documents to the Trustee during discovery resulting in the Debtor's waiver of her privilege, at least as to the subject in question. *See In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wisconsin Steel*, 666 F. Supp. 1148, 1153 (N.D. Ill. 1987) ("The general rule is that voluntary disclosure of privileged attorney-client communication constitutes waiver of the privilege as to all other such communications on the same subject."). Even given the deference to *pro se* debtors noted above, the court was not empowered to undo the Debtor's waiver.

In fact, the attorney-client privilege was only asserted once by the Debtor in the Adversary. During the Trustee's direct examination of Ebner, the Debtor asserted the privilege when the Trustee inquired as to the advice that Ebner gave to the Debtor regarding the Debtor filing for bankruptcy.[5] Tr. 151-66, Feb. 2, 2016. The court sustained the Debtor's objection. *Id.*

---

[5]    Ebner had a limited retention agreement with the Debtor. Debtor's Ex. No. 48; Dkt. No. 7. The retention was only for the initial matters of compiling documents and the filing of the Debtor's bankruptcy petition. At the Trial, the Debtor zealously maintained that distinction, stating that the only time that Ebner represented the Debtor was at the initial "intake" proceedings." Tr. 154, Feb. 2, 2016 ("MS. JOHNSSON: . . . I have not ever provided any document to Ms. Steege or to the Court related to any intake proceedings, and, in fact, the intake was the only time Ms. Ebner was, indeed, my attorney.").

The court did allow Ebner to testify to other communications between her and the Debtor that occurred after the initial stages of the Debtor's bankruptcy case because the Debtor never asserted the privilege to those communications. In fact the Debtor actively argued against it. *See e.g.,* Tr. 101, Feb. 2, 2016 ("MS. JOHNSSON: . . . There is no Attorney-Client Privilege here, and I am objecting to this man doing anything other than whispering to Ebner on the side.").[6]

Thus while it was highly unusual to have a discharge revocation case based, in some degree, on the testimony of a debtor's counsel, the result is what the law provides.

PROCEDURAL HISTORY AND EVIDENTIARY RULINGS

In considering the relief sought by the Trustee, the court has considered the evidence and argument presented by the parties at the Trial, has reviewed the Complaint, the attached exhibits submitted in conjunction therewith, and has reviewed and found each of the following of particular relevance:

(1)    Answer Regarding Adversary Complaint 14-A-00106 [Adv. Dkt. No. 23] (the "Answer");

(2)    Final Pretrial Order Governing Complaint to Revoke the Debtor's Discharge [Adv. Dkt. No. 77] (the "Final Pretrial Order");

(3)    Plaintiff's Pretrial Statement [Adv. Dkt. No. 83] (the "Trustee's Pretrial Statement");

(4)    Defendant's Pretrial Statement (the "Debtor's Pretrial Statement");[7] and

(5)    Order on Trustee's Objection to Debtor's Pretrial Statement [Adv. Dkt. No. 120].

The court has also considered the procedural history and previous court filings in the main bankruptcy case, including:

(a)    Voluntary Petition [Dkt. No. 1] (the "Petition");

(b)    Disclosure of Compensation of Attorney for Debtor(s) [Dkt. No. 7];

(c)    Schedules A-J [Dkt. No. 15] (the "Schedules"); and

(d)    Discharge of Debtor [Dkt. No. 37].

Though the foregoing items do not constitute an exhaustive list of the filings in the underlying bankruptcy case and the Adversary, the court has taken judicial notice of the contents of the docket in this matter. *See Levine v. Egidi,* Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent,* 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

---

[6]    Ebner brought counsel with her to the Trial.

[7]    While the Debtor's Pretrial Statement was not filed and placed on the court's docket, the Debtor did timely provide a hard copy of the document to both the court and the Trustee on January 14, 2016.

While the court's standard final pretrial order calls on parties to submit a joint, final pretrial statement, given the unusually contentious nature of this Adversary, prior to the Trial, the court issued the Final Pretrial Order requiring each party to file, on or before January 8, 2016, its own pretrial statement including a list of witnesses and a list of exhibits that the party planned to offer into evidence at the Trial. The Final Pretrial Order also allowed each party to file objections to the opposing party's pretrial statement, objections to the opposing party's witnesses and exhibits and to bring any motion *in limine* that the party wished to bring. The parties were required to file their individual objections and motions, if any, by January 22, 2016. Per the express terms of the Final Pretrial Order, failure to file an objection resulted in the waiver of any pretrial objections that could be raised.

The court held a hearing on January 26, 2016 to resolve the motions *in limine* and objections that had been raised. The Debtor presented seven motions *in limine* which were, for the most part, denied.[8] *See generally* Adv. Dkt. Nos. 86, 113-115, 117-119. On the eve of trial, the Debtor also brought a "Motion to Change Venue," which substantively was a motion to substitute the judge. Adv. Dkt. No. 100. This motion was also denied. Adv. Dkt. No. 116.

The Trustee, in turn, filed an Objection to the Debtor's Pretrial Statement. Adv. Dkt. No. 92. This objection was well taken, as it sought to limit the parties to presenting matters that were only applicable to the counts in the Complaint, and was granted. Adv. Dkt. No. 120 (the "Scope Order"). The Scope Order limited the parties to presenting only matters that were applicable to the 11 U.S.C. §§ 727(d)(1) and (d)(2) claims, and specifically barred the admission of testimony or evidence relating to "1) Trustee's settlement with the Debtor's ex-husband, Mark Rittmanic; 2) The Debtor's state court divorce proceedings against Mr. Rittmanic; 3) The Trustee's motivations in bringing this adversary proceeding; and 4) Issues that arose during the discovery process." Adv. Dkt. No. 120.

Though rulings on motions *in limine* are interlocutory and not appealable, *see Palmieri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996) ("An in limine evidentiary ruling does not constitute a final ruling on admissibility . . . and an appeal of such order is barred.") (citations omitted), the Debtor, without leave of court, appealed eight of the court's orders.[9] Adv. Dkt. Nos. 102, 104-107, 133-135. Though the eight appeals were assigned to eight different district court judges, all appeals were subsequently dismissed for lack of jurisdiction. Adv. Dkt. Nos. 145, 155, 165, 172, 173, 177, 178, 182.

At the January 26, 2016 hearing, pursuant to the Final Pretrial Order, all of the Trustee's exhibits were admitted in the absence of any objection from the Debtor. Similarly, the Debtor's Exhibit Nos. 1-3, 5-13, 17-20, 27, 29-31, 33 and 39 were admitted absent objection. The court

---

[8]    Only the Debtor's Fourth Motion in Limine for Hearing/Trial on Adversary Complaint #14-00106 – Re: Plaintiff's Proposed Witnesses [Adv. Dkt. No. 95] was granted in part and denied in part. Adv. Dkt. No. 113.

[9]    The Debtor appealed all the orders entered except for the order on the Debtor's Seventh Motion in Limine for Hearing/Trial on Adversary Complaint #14-00106 – Re: Plaintiff's Proposed Witness – Brent Kidwell, Jenner & Block's Chief Knowledge Counsel [Adv. Dkt. No. 94], which the court had denied as moot. Adv. Dkt. No. 115.

overruled the Trustee's objections and admitted Debtor's Exhibit Nos. 14, 32, 34-35, 38 and 40-44. The Trustee's remaining objections were preserved for the Trial.

At the Trial, the Trustee withdrew her objection to Debtor's Exhibit Nos. 4, 25-26 and 36 and these exhibits were admitted. The Debtor also presented four new exhibits. Debtor's Exhibit Nos. 45, 46 and 48 were not objected to and therefore were admitted. The court accepted Debtor's Exhibit No. 47, but reserved on the Trustee's relevance objection. The court did the same for Debtor's Exhibit Nos. 15-16, 21, 23 and 37. The court sustained the Trustee's objections as to Debtor's Exhibit Nos. 22, 24 and 28 and these exhibits were excluded.

Last, at the Trial the Trustee discovered that the Trustee's Exhibit No. 26, an email with a corresponding attachment, contained the wrong email attachment and moved to substitute the exhibit. The Debtor objected and the court reserved ruling. Given the court's ruling on Count I and that Exhibit No. 26 pertains only to that Count, however, the court need not to determine the admissibility of the Trustee's amended Exhibit No. 26.

As to the relevance objections on which the court reserved ruling, it is true that Federal Rule of Evidence 403 affords the court the authority to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In a bench trial, however, such as adversary proceedings in bankruptcy court, "there are no problems of juror prejudice." *Henderson v. Legal Helpers Debt Resolution, L.L.C.* (*In re Huffman*), 505 B.R. 726, 753 (Bankr. S.D. Miss. 2014). "Excluding relevant evidence in a bench trial . . . on the basis of 'unfair prejudice' is a useless procedure." *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981). The court, therefore, will weigh and determine the relevance of each exhibit in the course of concluding the material facts and the relevance objections are therefore overruled.

Finally, at the conclusion of the Trial, the court entered a Post Trial Scheduling Order [Adv. Dkt. No. 176] (the "Post Trial Order"). The Post Trial Order set a deadline for posttrial motions but otherwise prohibits the parties from filing any documents in relation to the Adversary without leave of court. No posttrial motions were filed. By its express terms, the prohibition in the Post Trial Order expires with the issuance of this Memorandum Decision.

## FINDINGS OF FACT[10]

Having dispensed with Count I earlier, the court will only focus the facts relevant under Count II. Count II, seeking to revoke the Debtor's discharge under section 727(d)(2) of the Bankruptcy Code, relates to a $53,242.06 inheritance that the Debtor received following the death of her uncle (the "Inheritance").[11]

---

[10]   To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Decision.

[11]   At the Trial, and throughout this Adversary, the Debtor objected to the use of the term "inheritance" as she claimed that she did not receive an inheritance under the legal meaning of the term. During the Trial,

From the review and consideration of the procedural background, as well as the evidence presented at the Trial (and in light of the court's evidentiary rulings above), the court determines the salient facts to be as follows, and so finds that:

A.    The Parties

    (1)   The Debtor is an individual domiciled in Chicago, Illinois.

    (2)   The Debtor is a certified professional accountant, college lecturer and fraud auditor. *See* Trustee's Ex. No. 69 (containing the Debtor's resume); Tr. 276, Mar. 7, 2016; Tr. 153, Mar. 10, 2016.

    (3)   The Debtor filed the Petition on September 21, 2011. At the time, Ebner represented the Debtor in the preparation and filing of the Petition and Schedules. Ebner had a limited retention agreement and only represented the Debtor on matters limited to the early stages of the Debtor's bankruptcy case.[12]

    (4)   The Debtor received her discharge on December 20, 2011.

    (5)   The Trustee is the chapter 7 trustee for the Debtor's bankruptcy estate.

B.    The Inheritance

    (6)   On December 17, 2011, the Debtor's uncle, John Cronin ("Cronin"), passed away.

    (7)   Cronin died intestate.[13]

    (8)   Cronin died without any children. The Debtor, her brother Donald Johnsson ("Donald") and sister Mary T. Johnsson ("Mary," and collectively with the Debtor and Donald, the "Johnssons") therefore administered Cronin's estate.

    (9)   The Johnssons hired attorney Michael Roberts ("Roberts") to assist in collecting and liquidating Cronin's estate.

    (10)  Roberts provided the Johnssons with a small estate affidavit, Debtor's Ex. No. 45 (the "Small Estate Affidavit"), which the Debtor and Donald used to close out Cronin's bank accounts.

---

"inheritance" was used to refer to the monies that the Debtor received following her uncle's death, *See* Tr. 186, Feb. 2, 2016, but that use was a convenient shorthand only. The actual determination is as set forth herein. Because, as discussed below, the court finds that the money received was an inheritance, "inheritance" refers to the monies that the Debtor received under the generally accepted meaning of the term.

[12]    For the majority of her bankruptcy case and this entire Adversary, however, the Debtor has represented herself.

[13]    While the Debtor repeatedly claimed that Cronin made a valid will prior to his death, no will, holographic or otherwise, was ever produced to the court.

(11) On May 4, 2012, the Debtor deposited $2,333.32 into her bank account with MB Financial Bank (the "MB Financial Account") as her share of the proceeds from the sale of Cronin's van (the "Van Proceeds"). Tr. 291, Mar. 7, 2016; Trustee's Ex. No. 32.

(12) On April 28, 2012, United Credit Union issued a check for $12,571.45 from Cronin's account to the Debtor as Cronin's heir (the "UCU Proceeds"). Trustee's Ex. No. 30.

(13) On May 12, 2012, the Debtor deposited $12,471.45 of the UCU Proceeds into the MB Financial Account and received the balance of $100 in cash. Tr. 292-93, Mar. 7, 2016; Trustee's Ex. Nos. 31, 34.

(14) On June 20, 2012, the Debtor deposited a $6,864.58 check that she received from Diamond Bank as Cronin's heir (the "Diamond Bank Proceeds"). The Debtor deposited $6,664.58 into the MB Financial Account and received the balance of $200 in cash. Tr. 295-96, Mar. 7, 2016; Trustee's Ex. No. 36.

(15) The Debtor received $31,472.71 from the sale of Cronin's condominium (the "Condominium Proceeds"). Tr. 298, Mar. 7, 2016.

(16) On October 4, 2012, the Debtor used the Condominium Proceeds to establish an account with BMO Harris, N.A (the "BMO Account"). Tr. 299, Mar. 7, 2016; Trustee's Ex. No. 38.

(17) In total, the Debtor received $53,242.06 from Cronin's estate, which collectively comprises the Inheritance.[14]

C.   Communications Between the Debtor, Ebner and the Trustee

(18) In January of 2012 the Debtor notified Ebner of Cronin's passing.

(19) On January 9, 2012, Ebner notified the Debtor by phone and in writing that:

> since his death occurred within 180 days of the bankruptcy petition filing, any inheritance that you [(the Debtor)] receive or are entitled to receive become property of the bankruptcy estate. If you are entitled to a portion of his estate, you must advise me, so that disclosure can be made to the bankruptcy trustee. Failure to disclose an asset such as an inheritance would be a bankruptcy crime.

Trustee's Ex. No. 29 (the "Inheritance Letter").

(20) On October 30, 2012, the Trustee learned that the Debtor received the Condominium Proceeds.[15] Trustee's Ex. No. 39. That same day, the Trustee contacted Ebner and

---

[14]   The court notes that in the Trustee's Pretrial Statement the Trustee states that the Debtor received a marginally different amount, $53,042.06, from John Cronin's estate. Trustee's Pretrial Statement, ¶ 77. The difference appears to be the result of the Trustee not including the full amount of the Diamond Bank Proceeds. *See id.* at ¶ 49 (listing the amount as $6,664.58). By the court's calculation, the total that the Debtor received is $53,242.06.

requested more information regarding these funds. Trustee's Ex. No. 40. Ebner responded that she would have to check her retention agreement to see if she still represented the Debtor in this matter. Trustee's Ex. No. 41. The Trustee then requested that "[i]n the meantime, can you [(Ebner)] forward this to [the Debtor] as I don't want to contact her on an adversarial issue if you are her counsel and tell her that she should not under any circumstances spend any money received from the sale until we get to the bottom of this." *Id.*

(21) On November 1, 2012, Ebner contacted the Debtor regarding the Trustee's inquiry as well as to remind the Debtor of the Inheritance Letter. The Debtor responded that she remembered the letter. She notified Ebner that Donald was the beneficiary of most of Cronin's assets and those assets that did not have a clear beneficiary were being sold by the Johnssons. The Debtor also stated that "I am also clear that my net share of these assets will become property of the bankruptcy estate so I have been keeping detailed records of everything – I just figured I would account for the whole death/inheritance as one transaction once it was all determined." Trustee's Ex. No. 42. Ebner responded that the accounting and turning over must be prompt. *Id.* Ebner also forwarded this correspondence to the Trustee. Trustee's Ex. No. 43.

(22) After receiving Ebner's permission to contact the Debtor directly, Tr. 167-68, Mar. 7, 2016, the Trustee emailed the Debtor on November 2, 2012. Trustee's Ex. No. 44. In the email, the Trustee asks the Debtor for information regarding the administration of the probate estate, any attorney who is acting for the decedent's estate and any documents that the Debtor has about the inheritance. *Id.* The Trustee also stated that "[t]o the extent that you have received any other property as a result of this inheritance, you need to tell me that and turn it over to me." *Id.* The Debtor responded that she will do so. *Id.*

(23) On November 7, 2012, the Debtor provided the Trustee with an accounting of any inheritance received.[16] Trustee's Ex. No. 45. The accounting indicated that the Debtor received $6,864.58. Though the accounting does not clarify the source, this evidently was the Diamond Bank Proceeds. Additionally, the Debtor explained what the Johnssons did when no beneficiary was provided for an asset. Specifically:

> When no beneficiary is indicated, we need to complete a small estate affidavit requesting the asset to be split in equal thirds between my brother, my sister and me, as we are my uncle's sole heirs. To date, three assets are in this category:
>
>> a. My uncle's van. We received two quotes . . . and sold to . . . the highest bid. I received $2,333.32.

---

[15]    The Trustee learned of the sale from the Debtor's ex-husband, Mark Rittmanic. While the court earlier ruled that "[t]he Debtor's state court divorce proceedings against Mr. Rittmanic" were irrelevant to the Adversary and therefore barred from the Trial, the fact that the Trustee learned of the Inheritance from a source other than the Debtor is, of course, relevant to this inquiry.

[16]    Distributions were allegedly based on a handwritten will the Debtor found, but that document was not produced to the court.

b. Shares of Prudential insurance stock. Despite the small estate affidavit instructions, Prudential made the check payable to my brother only. We settled up on this transaction at closing on my uncle's condo sale. I effectively received $471.30.

c. My uncle's studio condominium in Sandburg Terrace. I received $31,472.71pursuant to [*sic*] as proceeds from the sale (inclusive of the $471.30 Prudential shares sale mentioned in 4b above), after "settle-up" of many of the upfront expenses associated with my uncle's death.

*Id.*

(24) In the November 7, 2012 letter, the Debtor also noted that:

While I was clear all along that the proceeds of my inheritance would become due to the bankruptcy estate, I didn't realize that these assets/income were to be treated any differently than all the rest of the assets/income in mine or my husband's possession that actually belong to my bankruptcy estate (artwork, rugs boats, cash, marketable securities, business income).

a. I did not understand that the turnover of these assets was to be handled any differently than with the rest of the marital and personal assets that will need to be liquidated and/or turned over to fund the bankruptcy estate. I assumed that everything would be "netted" at the end of the process, as seems to be the case with all the assets/income my husband has been liquidating for his own personal pleasure without recourse. . . .

b. As I was expecting everything would have to be accounted for and settled up at the end of the bankruptcy proceedings, I have only spent the proceeds from the inheritance checks on two types of expenses:

i. Expenses related to my uncle's passing and/or payments of his expenses/obligations and /or collection/liquidation of his assets/income; and

> ii. Expenses related to court-custody
> trial expenses, bankruptcy
> motions/responses costs, foreclosure
>
> court expenses, divorce court
> expenses, expenses for custody trial . .
> . .

*Id.* The Debtor also noted that since receiving the Trustee's instructions from Ebner, the Debtor has not spent any of the remaining funds. *Id.*

(25) On the same day, by separate email, the Debtor also forwarded to the Trustee the HUD-1 Settlement Statement she received from the sale of Cronin's condominium. Trustee's Ex. No. 46. The Trustee responded that she wanted additional information as well as the turnover of any inheritance funds received. Trustee's Ex. No 47.

(26) The Trustee sent the Debtor a second email on November 8, 2012, stating that she still had not received the requested information or the turnover of the funds. Trustee's Ex. No. 48. The Debtor responded that she was busy with another court case that she was a party to but would re-send the accounting when she became free. *Id.* No mention was made of turning over the funds.

(27) On December 12, 2012, the Trustee sent a letter to the Debtor. The letter contained four requests: First, that the Debtor turn over the $31,472.71 received from the sale of Cronin's condominium and account for any money spent from these funds. Second, that the Debtor turn over any additional funds that had been received as part of the inheritance and account for any money spent from these funds. Third, that the Debtor provide a list of assets to which the Debtor was not a beneficiary to and an explanation of how that was determined. Last, that the Debtor examine her affairs and see if there is any other property that has not been reported and, if so, to report said property. The Trustee also reminded the Debtor of the consequences of not reporting and turning over property that should belong to the bankruptcy estate. *See generally* Trustee's Ex. No. 50 (the "Turnover Letter").

(28) The Debtor responded to the Turnover Letter through a series of emails dated December 12-19, 2012. The Debtor explained that due to a medical issue she would be unable to properly respond to the Trustee's letter immediately and requested that the Trustee give her more time to respond. *See generally* Trustee's Ex. No. 51. On December 19, 2012, the Debtor asked the Trustee to whom the check should be made out to. *Id.* After receiving the Trustee's response, the Debtor wrote out a check for $7,335.88 made payable to the Trustee. *See* Trustee's Ex. No. 38 (check made out to the Trustee on December 19, 2012).

(29) On December 20, 2012, the Debtor sent the Trustee a detailed response to the Turnover Letter. Trustee's Ex. No. 52. The Debtor explained the disposition of Cronin's assets as follows:

> 1) I still expect to find a valid, signed will from my uncle once we
> clear through all the remaining boxes. . . .

a. I believe the signed will shall reflect exactly what we
have already found in the handwritten will that I
referred to in my November, 2, 2012 letter to you,
and exactly what my uncle verbally told me. The
studio condominium at 1560 N. Sandburg Terrace,
Chicago, IL was supposed to be 100% left to my
brother. I have the original of the handwritten will
that I will show to you at the in-person meeting (his
handwriting was very light and a scanned copy is
illegible), and may even find the actual signed will by
the time of our meeting . . .

b. We did sign documents without the signed will
being found to split the proceeds three ways so that
we could move forward with the condominium sale
and not have to keep paying the monthly assessments.
Our lawyer said the title company wouldn't rely on
the unsigned handwritten will we had already found.

c. My brother trusted that my sister and I would pay
him back when the will was found and also knew we
both needed money given the highly contested
divorces my sister and I are both going through so he
didn't mind lending us the money.

d. Therefore, it is still unclear whether or not any of
these sales proceeds are owed to my bankruptcy
estate.

2) The same handwritten will referenced in item 1 above indicates
that my uncle wanted to leave his van to my sister. Therefore it is also
unclear whether or not any of the van sale proceeds are owed to my
bankruptcy estate.

3) The Prudential stock and the old savings account . . . (both assets
which were outlined in detail in my November 2, 2012 letter to you)
were not listed on the handwritten will . . . I do expect that the
proceeds from these two assets will be proved to be the property of
my bankruptcy estate once we find my uncle's signed will. To that
end, I am enclosing a check for the proceeds from the savings
account $6,864.58 and the Prudential stock $471.30, totaling
$7,335.88.

Trustee's Ex. No. 52.

(30) The Trustee, through her counsel, responded on December 28, 2012.  The Trustee stated
"[w]hile you [(the Debtor)] state in your letter that you expect to find a signed will that
bequests the condominium exclusively to your brother, my understanding is that you have

found no such document to date. As such, it is not appropriate for you to withhold the proceeds. Please turn them over to the Trustee immediately." Trustee's Ex. No. 53. The Debtor responded that she had spent most of the Condominium Proceeds. Trustee's Ex. No. 54. She stated that:

> I do not have the funds from the sale of uncle's condo beyond what I have already mailed to you and/or disclosed in my prior letters to you. I could use some of the remaining proceeds in the BMO account to make the copies of the documents you are requesting in advance if you agree and/or I can close that account and send you the remaining balance, even though I think the bankruptcy estate will end of [*sic*] having to give those funds back to my brother when we find the actual will beyond the handwritten one we already have.

*Id.*

(31) On February 22, 2013, the Debtor closed the BMO Account and delivered the remaining balance of $3,586.65 to the Trustee. Trustee's Ex. Nos. 38 and 70. No further funds were turned over to the Trustee.

(32) On April 15, 2013, the Debtor and the Trustee spoke by phone concerning the Inheritance and any funds that had yet to be turned over. Tr. 179, Mar. 7, 2016. The Debtor memorialized that conversation in a letter dated April 17, 2013. Trustee's Ex. No. 60. During the course of the conversation and in the letter, the Debtor stated that she did not have any income to begin constructing a repayment plan. As the Trustee explained during the Trial, the Debtor "said that she anticipated that in May there would be some type of hearing in the divorce case that would provide her with funds of some sort, and that if she did have to turn something over, that she'd be in a position to do it in May." Tr. 179-80, Mar. 7, 2016. The Debtor's letter states that she "would get back to [the Trustee] with a potential repayment plan for the monies I have not already turned over to [the Trustee] after the upcoming hearing on support in Domestic Relations Court[.]" Trustee's Ex. No. 60. Both parties agreed to revisit the issue on May 31, 2013. Tr. 180, Mar. 7, 2016; Trustee's Ex. No. 60.

(33) On May 31, 2013, the Trustee, through counsel, sent the Debtor a letter requesting information on how the Debtor planned to pay the remaining portion of the Inheritance owed to the Trustee. Trustee's Ex. No. 62.

(34) On October 29, 2013, the Trustee, through counsel, sent the Debtor a letter discussing the remaining issues concerning her bankruptcy case, including the Inheritance. Trustee's Ex. No. 63. The Trustee proposed that the Debtor "provide an accounting of all distributions made by the [Cronin's] estate . . . an accounting of subsequent transfers of the Cronin estate funds you received, and an affidavit attesting to the accuracy of those accountings." *Id.* The Trustee further proposed that the Debtor "immediately turn over to the Trustee all Cronin estate proceeds still in your possession and agree to a repayment plan for any Cronin estate proceeds that you received but no longer have." *Id.* Alternatively, the Trustee stated "[i]f economic hardship prevents you from repaying estate proceeds, then we propose you agree to waive the discharge of your debts in bankruptcy." *Id.*

(35) On December 13, 2013, the Trustee, through counsel, sent a letter to the Debtor that outlined all the attempts that the Trustee made to reach a resolution to the Inheritance issue. The Trustee noted that everyone wanted to avoid the cost of litigation and requested that the Debtor either accept the Trustee's proposal found in the Trustee's October 29, 2013 letter or to make a counterproposal. Either way, the Trustee requested a prompt response. Trustee's Ex. No. 64.

(36) On January 24, 2014, the Trustee, through counsel, sent a final letter to the Debtor indicating that the Trustee received no response to the Trustee's previous letters and therefore will be forced to file an attached complaint to revoke the Debtor's discharge. The Trustee gave the Debtor until February 7, 2014 to contact her in order to find an out-of-court resolution to these issues. Trustee's Ex. No. 65.

(37) While the Debtor did reach out to the Trustee in February of 2014, nothing substantive resulted from their meeting.

(38) The Adversary was filed on February 17, 2014.

## APPLICABLE LAW

Count II of the Complaint seeks, in relation to the Debtor's handling of the Inheritance, to revoke the Debtor's bankruptcy discharge under section 727(d)(2) of the Bankruptcy Code.[17]

"Revocation of a discharge is a harsh measure and runs contrary to the general policy of the Bankruptcy Code of giving chapter 7 debtors a 'fresh start.' The revocation provision will be construed strictly against the objector and in favor of the debtor's retention of the discharge." *State Bank of India v. Kaliana (In re Kaliana)*, 202 B.R. 600, 603 (Bankr. N.D. Ill. 1996) (Squires, J.) (internal citations omitted); *see also Disch v. Rasmussen*, 417 F.3d 769, 777 (7th Cir. 2005) ("The Bankruptcy Code places strict limits on a court's authority to revoke a discharge."). The party seeking to revoke the discharge bears the burden of proof, *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992); *Eckert*, 375 B.R. at 478 (collecting cases), by a preponderance of the evidence. *Eckert*, 375 B.R. at 478 (collecting cases).

Section 727(d)(2) provides that the court shall revoke a discharge granted under section 727(a) of the Bankruptcy Code if "the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee[.]" 11 U.S.C. § 727(d)(2). The statute essentially provides three elements to warrant a revocation of discharge: (1) that the debtor acquired or became entitled to acquire property of the estate; (2) that the debtor knowingly and fraudulently failed to report its acquisition or entitlement, or to surrender it to the trustee; and (3) that the debtor's failure was knowingly and fraudulent. *Id.*; *Rezen v. Barr (In re Barr)*, 207 B.R. 168, 174 (Bankr. N.D. Ill. 1997) (Schmetterer, J.).

---

[17]    During the Trial, the Debtor expressed concerns that this was a criminal proceeding. It is not. A proceeding "to vacate discharge in bankruptcy is a civil, not a criminal proceeding." *Skarbinski v. Henry H. Krause Co.*, 378 F.2d 656, 657 (6th Cir. 1967).

By using "shall," section 727(d) provides no discretion to the court. "The word 'shall' is ordinarily 'The language of command.'" *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (citation omitted). Therefore, "[s]ection 727(d) makes revocation mandatory if the criteria spelled out in that section are satisfied[.]"). *Disch*, 417 F.3d at 778.

The Trustee alleges that the Debtor acquired property of the estate in the form of the Inheritance and that the Debtor then knowingly and fraudulently failed to both report the Inheritance and to surrender it to the Trustee. The court will examine each element in turn.

A.    <u>Acquiring or Becoming Entitled to Acquire Property of the Estate</u>

A debtor's property interest is generally created and defined by state law. *Butner v. U.S.*, 440 U.S. 48, 54 (1979). The Bankruptcy Code does, however, qualify whether such property interests become property of a debtor's bankruptcy estate.

Section 541(a)(1) broadly states that the bankruptcy estate comprises of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The statute continues, in relevant part, to state property of the estate also includes "[a]ny interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and the debtor acquires or become entitled to acquire within 180 days after such date . . . by bequest, devise, or inheritance." 11 U.S.C. § 541(a)(5)(A).

The best evidence of an individual receiving an inheritance is a will or the creation of a probate estate. However, no valid will for Cronin has ever been found or produced to this court. In Illinois, where there is no will and the gross value of a decedent's estate does not exceed $100,000.00, that estate may be administered by means of small estate affidavits. 750 ILCS 5/25-1; *Peterson v. Wallach*, 314 Ill. App. 3d 823, 828 (1st Dist. 2000). For Cronin, the Johnssons did just that. Tr. 117-18, 156; Mar. 10, 2016. The Debtor, in fact, introduced the Small Estate Affidavit that was used into evidence. *Id*; Debtor's Ex. No. 45.

Because there was no probate adjudication of Cronin's estate, however, the court is left with determining what, in this process, if any, constituted an inheritance.

In Illinois, the right to take property by inheritance "is purely a statutory right which rests wholly within legislative enactment[.]" *Eckland v. Jankowski*, 407 Ill. 263, 268 (1950) (*citing Jahnke v. Selle*, 368 Ill. 268, 271 (1938)). The Illinois Probate Act of 1975 prescribes, in relevant part, that "[i]f there is no surviving spouse or descendant but a parent, brother, sister or descendant of a brother or sister of the decedent: the entire estate [shall be distributed] to the parents, brothers and sisters of the decedent in equal parts[.]" 755 ILCS 5/2-1(d). By common parlance, such a right makes one an heir to the decedent's estate and gives rise to an inheritance. *See Dillman v. Dillman*, 409 Ill. 494, 502 (1951) ('Heirs' "designates all those persons, whether many or few, upon whom the law would cast the inheritance in case of intestacy") (citations omitted); BLACK'S LAW DICTIONARY 903 (10th ed. 2014) (An inheritance is generally "[p]roperty received from an ancestor under the laws of intestacy[,]" or by bequest or devise"). No one disputes that Cronin was survived only by his sister's descendants, the Debtor and her siblings. He also died without a valid will. As a result, any funds that the Debtor received from Cronin's estate is an inheritance.

As the Debtor became entitled to acquire the Inheritance on December 17, 2011 when Cronin passed away, *see In re Chenoweth*, 3 F.3d 1111, 1112 (7th Cir. 1993) (holding that the date of death is relevant date of inquiry for the applicability of section 541(a)(5)(A)), the Debtor was entitled to the Inheritance within 180 days of filing for bankruptcy and the Inheritance is property of the Debtor's bankruptcy estate pursuant to section 541(a)(5)(A).

B.   Failing to Report and Deliver or Surrender Property of the Estate

It is undisputed that the Debtor failed to turn over the full amount of the Inheritance to the Trustee. She also, in the court's determination, failed in her duty to report the acquisition or entitlement to the Inheritance to the Trustee.

The Debtor first learned of the possibility of an inheritance on December 17, 2011, when Cronin died. As is evident by her conversation with Ebner, at that time the Debtor had neither received any money nor believed that she would receive any money. *See* Inheritance Letter. She was, however, informed that should she receive any inheritance it would belong to the bankruptcy estate and she must report it. *Id.* This clearly established that the Debtor, at the very least, was informed of her duty to report and turnover any inheritance that she may receive. For whatever reason, the Debtor decided to ignore this duty.

On April 28, 2012, the Debtor received the first portion of the Inheritance, the UCU Proceeds. Trustee's Ex. No. 30. On May 4, 2012, the Debtor received the Van Proceeds. Trustee's Ex. No. 32. On June 20, 2012, she received the Diamond Bank Proceeds. Trustee's Ex. 36. Finally, in October of 2012, she received the Condominium Proceeds and used them to open the BMO Account. Trustee's Ex. No. 38. For each of these assets, the Debtor has admitted to receiving and dissipating the funds. Tr. 291, 292-93, 295-96, 299, Mar. 7, 2016. Likewise, the Debtor admitted that she never amended her schedules to reflect the receipt of these assets. *Id.* at 291, 294, 297, 299. In fact, if not for the Debtor's ex-husband, the Trustee may never have learned of these assets. *See* Trustee's Ex. No. 39.

The Debtor had a clear duty to report the receipt of the Inheritance. Even if she believed that the property was not property of the estate, she still needed to report it. *See Yonikus*, 974 F.2d at 904. The Debtor, at one point, argued that she was waiting for Cronin's estate to be fully settled to resolve the matter with the Trustee in one transaction. The Debtor's conduct, however, is more indicative of someone who only dealt with her disclosure responsibilities once she knew someone else was aware of them. A prime example is the UCU Proceeds. She received this payment on April 28, 2012 and deposited it on May 12, 2012. Trustee's Ex. Nos. 30, 31. However, the Debtor never reported this asset. Its mention is entirely missing from the Debtor's emails to Ebner and the two accountings that the Debtor sent to the Trustee. *See generally* Trustee's Ex. Nos. 42, 45, 52. Because the Trustee does not raise them, neither does the Debtor.

Even if the court were to accept that the Debtor's reporting was sufficient, which it does not, the Debtor still has not delivered the Inheritance, in full, to the Trustee. That, as noted above, is undisputed and the Debtor admits to such. Tr. 302, Mar. 7, 2016. When asked if she received assets from Cronin's passing, the Debtor affirmatively replied with "I did." Tr. 289, Mar. 7, 2016. Specifically, the Debtor admitted that she received the Van Proceeds, the UCU Proceeds, the Diamond Bank Proceeds and the Condominium Proceeds. *Id.* at 289, 291-92, 295, 299.

Despite repeated efforts from the Trustee to obtain the funds and the Debtor's statutory obligation to turn over the funds, *see* 11 U.S.C. § 542 (turnover of property of the estate), the Debtor drew out the process; making only a *de minimus* payment but never proposing a means of repaying the remainder to bankruptcy estate. *See generally* Trustee's Ex. Nos. 53-65. Finally, the Debtor simply stopped responding to the requests until litigation was threatened. *See* Trustee's Ex. Nos. 62-64. These are not the actions of someone who intended to repay the bankruptcy estate, nor someone who believed the Trustee's assertions were in error.

Nor can the Debtor claim ignorance of the law as a defense. As a *pro se* litigant, the Debtor is responsible for knowing the law when representing herself. *See Faretta*, 422 U.S. at 834 n.46. The Trustee is not responsible for notifying the Debtor of her duties, nor conduct the administration of the bankruptcy in a manner the Debtor dictates. It is, rather, the Debtor who has a duty of cooperating with the Trustee. *See* Fed. R. Bankr. P. 4002(a)(4). However, even where both the Trustee and Ebner informed the Debtor of her obligations, the Debtor still chose not to comply with them.[18]

It is clear, therefore, that the Debtor failed to report and to deliver or surrender the Inheritance to the Trustee. As such, the second element of section 727(d)(2) is satisfied.

C.    <u>Knowingly and Fraudulently</u>

The critical remaining question, therefore, is whether this failure was done knowingly and fraudulently.

"To find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify a finding of fraud." *Yonikus*, 974 F.2d at 905 (*citing Werner v. Puente (In re Puente)*, 49 B.R. 966, 969 (Bankr. W.D.N.Y. 1985)). "The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied." *Id* (citations omitted) "Debtors have an absolute duty to report whatever interest they hold in property, *even if they believe their assets* are worthless or *are unavailable to the bankruptcy estate.*" *Id.* at 904. (emphasis added); *see also Rafool v. Wilson (In re Wilson)*, 290 B.R. 333, 340 (Bankr. C.D. Ill. 2002) (debtors, even *pro se* debtors, "have the ultimate responsibility for the accuracy for the information contained in their schedules, which cannot be avoided by playing ostrich.").

"Direct evidence of a defendant's state of mind at the time of an alleged fraud rarely exists." *Sheikh v. Mukhi (In re Mukhi)*, 254 B.R. 722, 729 (Bankr. N.D. Ill. 2000) (Schmetterer, J.) (discussing fraudulent intent in the context of a dischargeability action) (citation omitted). Under section 727(d)(2), a "finding of fraudulent intent may be based on inferences drawn from a course of conduct. . . . Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances." *Yonikus*, 974 F.2d at 905 (citations omitted). "The focus is on whether the debtor's actions appear so inconsistent with [her] self-serving statement of intent that the proof leads the court to disbelieve the debtor." *Fokkena v. Klages (In re Klages)*, 381 B.R. 550, 554 (B.A.P. 8th Cir.

---

[18]    For example, as discussed later, the Debtor created a new theory, at the Trial, that the Inheritance was a loan from Donald in an attempt to avoid the consequences of her actions.

2008) (citation omitted). Moreover, "'knowingly,' includes the failure to timely deliver, with knowledge that the property was not [the debtor's], and that, at a minimum, [the debtor] was required to report its acquisition to the Trustee." *Wallick v. Thunberg (In re Thunberg)*, 413 B.R. 20, 26 (Bankr. D.R.I. 2009), *aff'd sub nom. Thunberg v. Wallick*, Case No. CIV.A. 09-419 S, 2010 WL 1838003 (D.R.I. May 5, 2010), *aff'd sub nom. In re Thunberg*, 641 F.3d 559 (1st Cir. 2011).

The totality of a debtor's postpetition conduct, including claims of innocence contrasted with a debtor's overt actions, can be used to satisfy the Trustee's burden to show that the debtor acted with the requisite intent to defraud. *Id.* The fraudulent nature of a debtor's nondisclosure could be inferred from a debtor's recalcitrance in providing necessary information to the trustee and delay in actually turning over property of the estate to the trustee. *See generally, Olsen v. Reese (In re Reese)*, 203 B.R. 425 (Bankr. N.D. Ill. 1997) (DeGunther, J.). Finally, "concealment of assets is sufficient to find fraudulent intent on the part of the Debtors." *Id* (*citing Yonikus*, 974 F.2d at 906).

The Debtor does not dispute that she received the funds. In total, the Debtor admitted to receiving $53,242.06 from Cronin's estate. The Debtor does, however, argue that the funds she received were not an "inheritance" in the legal sense of the term. As noted above, the argument is mistaken and the Debtor's subjective belief, no matter how sincerely held, does not change the nature of the inheritance. *See Edgewater Walk Apartments v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 503 (N.D. Ill. 1993) ("Opinion evidence is not binding on the fact finder even if no contradictory evidence is offered by the other side.") (citations omitted).

If sincerely held, however, that belief might defeat this last element of section 727(d)(2). But the Debtor's own actions toward the Inheritance challenge the sincerity of her belief in this regard.

While the Debtor has repeatedly asserted that she wrongfully received the Inheritance and that all the money should have gone to Donald, her actions have been to the contrary. Donald testified that whenever he and the Debtor went to liquidate one of Cronin's assets both Donald and the Debtor would receive their portion of the proceeds. This applied to closing down Cronin's account with a teacher's credit union, Tr. 132, Mar. 8, 2016,[19] the sale of Cronin's van, *id.* at 133-34, and the closing down Cronin's account with Diamond Bank. *Id.* at 134. At no point in the Trial did any party inquire with Donald whether he knew of the existence of a will and whether such a will named him the sole beneficiary (or that he was ever told that he was supposed to be the sole beneficiary of such a will).[20]

---

[19]    The court notes that it is not entirely clear which asset this is referring to. During the Debtor's direct examination of Donald, Donald stated that the Debtor received a check from the "teacher's credit union" which was located on South Pulaski. Tr. 132, Mar. 8, 2016. However, the only other indications of Cronin's credit union assets are the Debtor's receipt of the UCU Proceeds from United Credit Union which has a service center on "4444 S. Pulaski Rd, Chicago, IL 60632," Trustee's Ex. No. 30, and the Debtor's acknowledgment in her letter to the Trustee that Cronin had funds at the Chicago Teacher's Union, Trustee's Ex. No. 52. It is possible that Donald was referring to either of these payments, but this point was never clarified at the Trial.

[20]    Donald's ability to draw such distinctions is not clear. At the Trial, the Debtor made clear that Donald was limited in certain ways and may not have been able to comprehend the complexity of such legal concepts. Tr. 148, Mar. 10, 2016. Nonetheless, no questions were posed, so how he might have answered is pure speculation.

The Debtor testified at the Trial that where an asset did not have a listed beneficiary, the Johnssons would use the Small Estate Affidavit to liquidate those funds. Tr. 117-18, Mar. 10, 2016. The Small Estate Affidavit, one of the Debtor's exhibits (Debtor's Ex. No. 45), itself lists the Debtor as an heir and that she is entitled to one-third portion of Cronin's estate. Small Estate Affidavit.

Recall that the Debtor argued that the funds were mistakenly paid to her. But the Debtor treated the funds as hers once she received them. The deposits into MB Financial Account and the BMO Account reflect that the Debtor took a portion of each distribution in cash. *See generally* Trustee's Ex. Nos. 32-38. The Debtor promptly dissipated those funds that were deposited.

At the Trial the Debtor explained this behavior by adopting a new theory, that the Inheritance actually consisted of loans from Donald that she was going to pay back. Tr. 148, Mar. 10, 2016. This theory, and the Debtor's testimony regarding it, are entirely unconvincing.

First, it contradicts the Debtor's own description of how such loans took place. The Debtor testified that whenever her family lent money to one another, they always created a promissory note. *Id.* at 116 ("And we would always sign notes so that we had that straight."). In support of this contention, the Debtor provided a series of promissory notes where she borrowed money from Cronin. *See* Debtor's Ex. No. 15. No promissory notes for the alleged loans from Donald were produced at the Trial.

Second, the Debtor testified that "[i]f it was a loan from my brother, it would be an even amount." Tr. 295, Mar. 7, 2016. All the Inheritance payments were for uneven amounts. *See* Trustee's Ex. No. 32 (deposit of Van Proceeds of $2,333.32); Trustee's Ex. No. 30 (UCU Proceeds check of $12,571.45); Trustee's Ex. No. 36 (deposit of Diamond Bank Proceeds of $6,864.58); Tr. 298, Mar. 7, 2016 (Debtor's testimony of receipt of $31,472.71 as the Condominium Proceeds).

Third, each of the Inheritance payments was equal to the Debtor's one-third interest in whatever property was being liquidated. The Debtor explained as follows:

> My brother actually quit giving me loans during that period of time because I had received this money [(the Inheritance)], and that I had explained to him that I thought this money was due back to him. And he said, well, use it now, and so I was using it then. So I do consider all that money to be loans from my brother that needed to be repaid to my brother.

Tr. 162, Mar. 10, 2016. However, the Debtor's statements were never corroborated by any document or statement from Donald.

This loan theory was entirely new at the Trial. Throughout numerous prior communications with the Trustee the Debtor had maintained that she knew any inheritance would be property of the estate and would become due to bankruptcy estate. *See e.g.,* Trustee's Ex. No. 45. At the Trial, however, the Debtor explained that she did not believe that it was an "inheritance" in the legal sense of the term and that she was merely mimicking the terminology that others were using. Tr. 166, Mar. 10, 2016. This however is no excuse. The Debtor was still responsible for her actions and statements. *Faretta,* 422 U.S. at 834 n.46 ("The right of self-representation is not . . . a license not to comply with relevant rules of procedural and substantive law.").

23

The Debtor's actions are quite simply at odds with the theories she espouses, and her testimony was, at best, unconvincing. Courts have used a debtor's financial knowledge and sophistication as a basis for evaluating a debtor's claims of ignorance or naiveté of the reporting requirements found in the Bankruptcy Code. *See, e.g., Schlant v. Galan (In re Galan)*, 522 B.R. 744, 754 (Bankr. W.D.N.Y. 2014); *McCarthy v. Nandalall (In re Nandalall)*, 434 B.R. 258, 270 (Bankr. N.D.N.Y. 2010). In *Galan*, for example, the court found that the debtor was sufficiently experienced and sophisticated in real estate, financial and bankruptcy matters to make his claims of ignorance of his duties as a debtor under the Bankruptcy Code not credible. *Galan*, 522 B.R. at 754. In *Nandalall*, the court found that the debtor, a sophisticated real estate investor, acted with the requisite fraudulent intent when he transferred property of the estate which he knew had value and failed to advise the trustee of the property transfer or to surrender the property to the trustee. *Nandalall*, 434 B.R. at 270. Likewise, while acting *pro se*, the Debtor is a sophisticated financial professional whose claims are entirely unsupported by the information she clearly was aware of.

Based on the record presented the court must therefore find that the Debtor, at the very least, acted with such reckless behavior in failing to report and deliver the Inheritance to the Trustee so as to justify a finding of fraud. *Yonikus*, 974 F.2d at 905. As such, the court finds that the Trustee has met her burden under section 727(d)(2) that the Debtor's actions were knowing and fraudulent.

## CONCLUSION

As noted above and for the foregoing reasons, the court lacks jurisdiction to decide Count I of the Complaint and therefore makes no findings of fact or conclusions of law as to that claim. Count I will be dismissed. As the foregoing demonstrates, however, the Trustee has carried her burden with respect to each of the elements of section 727(d)(2). The court, therefore, finds that the Trustee has established that the Debtor's discharge must be revoked pursuant to section 727(d)(2). Accordingly, judgment will be entered in favor of the Trustee on Count II of the Complaint, and the Debtor's discharge will be revoked.

A separate Order will be issued concurrent with this Memorandum Decision.

Dated: June 2, 2016

Timothy A. Barnes
United States Bankruptcy Judge